No. 95-3063

Audrey Miner, mother and                    *
natural guardian of Kimberly               *
Miner,                                       *
                                             *
            Appellant,                       *
                                             *
      v.                                     *   Appeal from the United States
                                             *   District Court for the District
United States of America,                    *   of South Dakota.
                                             *
            Appellee.                        *


                        Submitted:  May 17, 1996

                           Filed:  August 22, 1996


Before MAGILL, ROSS and MURPHY, Circuit Judges.


ROSS, Circuit Judge.


      Appellant Audrey Miner (Miner), mother and natural guardian of
Kimberly Miner, filed this medical malpractice action against the United
States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq.,
alleging Kimberly suffered permanent physical impairment as a result of the
negligent care provided by Indian Health Service (IHS) employees during
Kimberly's birth.  Miner now appeals the district court's[1] conclusions that
the United States did not breach the standard of care during the delivery
and care of Kimberly, and that Miner failed to establish that any actions
or inaction by the

_____

      [1]The Honorable Richard H. Battey, United States District
Judge for the District of South Dakota.

United States or its employees were the proximate cause of Kimberly's condition.

I.

Kimberly Miner is a seven-year-old Native American child and a resident of Whitehorse, South Dakota, located on the Cheyenne River Indian Reservation. During her third trimester of pregnancy, Kimberly's mother, Audrey Miner, was abused by her husband on at least two occasions. Miner stated that she had been struck in the abdomen. On November 27, 1988, Miner was involved in a traffic accident and suffered a blow to her abdomen.

On December 25, 1988, Miner was admitted to the IHS hospital in Eagle Butte, South Dakota, with irregular contractions. Although labor had not actually begun, Miner remained in the hospital because of bad weather conditions and lack of transportation to her remote home. On January 2, 1989, Miner began regular contractions and began pushing with contractions at noon on January 3, 1989. At approximately 2:00 p.m., Dr. Margaret Upell, an IHS family practice physician, attempted to aid delivery by the use of a mid-forceps procedure. Dr. Upell had performed approximately 25 forceps deliveries, but Kimberly was the first mid-forceps delivery she attempted. It is undisputed that a mid-forceps delivery is more difficult than a normal forceps procedure. When this procedure failed, Dr. Upell and Dr. Manary, a staff pediatrician, attempted to use a vacuum extractor to aid delivery. This procedure was also unsuccessful.

Dr. Robert Wingert, an OB-GYN specialist, who was in the hospital at the time the mid-forceps procedure was attempted, was then consulted and conducted an ultrasound and found the baby was not in distress. He recommended that Miner be transferred to Pierre, South Dakota, by ambulance for possible forceps delivery under anesthesia, or if appropriate, for caesarean section

-2-

delivery.  The Eagle Butte IHS hospital did not have the capability to perform a caesarean section.

While the ambulance was en route to Pierre, Miner spontaneously delivered Kimberly at 3:47 p.m.  Dr. Upell, who was present in the ambulance, performed the delivery.  Kimberly was found to have suffered a skull fracture during the prior attempted mid-forceps procedure.  She exhibited bruises on both eyelids and on the posterior right side of her neck.  She had a forceps mark on the right side of her scalp and a superficial laceration at the base of her skull.

Kimberly's apgar scores were normal right after birth, and while in the hospital it was noted that she was vigorous, was feeding well, and was under no respiratory distress.  Except for the superficial bruising, she appeared to be a normal, healthy baby.  Kimberly left the hospital on January 13, 1989.

Kimberly has since been diagnosed with mild pervasive developmental disorder (PDD), which is characterized by uneven intellectual and emotional development.  The etiology of PDD is unknown and can be found in individuals who do not have brain damage.  Kimberly also suffers from possible seizure disorder, and is medicated for such seizures.  She has also been diagnosed with mild left-side hemiparesis.

Most of the complaints as to Kimberly's physical and mental condition are supplied by Miner.  The district court found that Miner was not a credible witness, in that "[a]t every opportunity she attempted to maximize her claim.  Her characterization of Kimberly's condition was often exaggerated.  While Kimberly did have a slight left hemiparesis, she had no seizure disorder reported except from her mother."  Dist. Ct. op. at 5.

Dr. Barbara Geller, a child psychologist, opined that

Kimberly's PDD is not the result of any birth trauma and noted generally that PDD occurs in normal births where there is no trauma. Dr. Geller stated that Kimberly's PDD is a minor variation and noted that Kimberly is functioning well in school. Kimberly's Head Start teacher stated that Kimberly was happy, eager to learn, exhibited no strange behavior, and was an average student. The teacher never observed a seizure and did not have to administer medication for seizures.

## II.

The district court held that Miner failed to establish (1) that the United States breached its duty of care in relation to Kimberly's delivery, and (2) that the actions or inaction of the government were the proximate cause of Kimberly's condition. While the conclusion that the United States did not breach its standard of care is questionable, we do not discuss this portion of the argument because we conclude that Kimberly's condition is not the proximate result of the United States' actions or inaction.

Questions of proximate cause are to be determined by the trier of fact and thus are reviewable under a clearly erroneous standard. Nelson v. Nelson Cattle Co., 513 N.W.2d 900, 903 (S.D. 1994).

Miner argues that the violation of the standard of care was the proximate cause of the injuries Kimberly sustained. Appellant's expert testified that as a result of the attempted mid-forceps delivery, Kimberly suffered a skull fracture and the resulting neurological deficits were caused by the birth trauma.

The district court found that Miner failed to establish that either the injuries Kimberly suffered at birth, or the actions or inaction of the United States, Dr. Upell, or any other employee, caused Kimberly's PDD, possible seizure disorder, or mild left-hemiparesis. We agree.

-4-

The medical records indicated that other than the skull fracture and bruising on her eye and scalp, Kimberly appeared to be a normal, healthy baby. Her apgar scores were normal at birth and her post-delivery progress was normal. Dr. Isburg, a pediatrician, testified that skull fractures are not uncommon in normal deliveries and that Kimberly's skull fracture was not related to her brain injury. Dr. Kelts, a board-certified pediatric neurologist who treated Kimberly as a consulting physician, also testified that the skull fracture did not cause any internal brain injury and was not the cause of Kimberly's mild left hemiparesis.

After reviewing the results of an MRI examination, Dr. Sharon Byrd, a board-certified pediatric neurologist, testified that there were two separate injuries to the brain: one was a minimal linear skull fracture that occurred at birth; the second was a significant event that caused injury to the brain prenatally sometime between the 20th and 35th weeks of gestation, which coincides with the time period when Miner was abused by her husband and involved in the car accident. According to Dr. Byrd, the prenatal brain injury was an infarct, or damage to the deep white matter of the brain caused by lack of oxygen or blood. Because it involved the deep area of the brain, the injury had to have occurred earlier in gestation, and not at the time of delivery. Dr. Byrd stated that this type of prenatal event to the deep white matter can result in paresis and/or seizure disorder and that Kimberly's symptomatology was consistent with such a prenatal event. Both Dr. Byrd and Dr. Prensky, a pediatric neurologist, agreed that there was no damage to the cortical, or surface area of the brain, thereby ruling out any injury at the time of delivery. Dr. Byrd concluded that the skull fracture did not correlate in any way with the prenatal brain injury she observed.

Based on the evidence presented at trial, we conclude the district court did not err in concluding that Miner failed to establish that Kimberly's injuries were the proximate result of the

-5-

United States' actions.

### III.

Trial was set for March of 1995, and on December 19th, 1994, the government moved to supplement their designation of expert witnesses, adding Dr. Sharon Byrd. Because of delays in obtaining discovery by the government, the district court allowed the government to belatedly add Dr. Byrd to its list of designated experts. Because Dr. Byrd would testify that Kimberly's brain damage had occurred between the 20th and 35th weeks of gestation, and not at birth, on February 28, 1995, Miner moved the court to supplement the designation of expert witnesses to add Dr. Charles Truwit to rebut that testimony. This motion was granted and Dr. Truwit was added to the list of designated experts.

Also in the same February 28, 1995 motion, Miner sought to designate Dr. Larry Burd to rebut the opinion of certain government experts to the effect that PDD has no known etiology of brain trauma. The court denied this motion to supplement, concluding that Miner had already designated Dr. Sharon Satterfield, a psychologist who had diagnosed Kimberly as suffering from PDD and who was listed as an expert to testify regarding the subject of PDD. The court concluded that Dr. Burd's testimony would be duplicative of those witnesses previously designated. This court will not reverse a district court's decision regarding discovery absent a "gross abuse of discretion resulting in fundamental unfairness in the trial of the case." Derby v. Godfather's Pizza, Inc., 45 F.3d 1212, 1215 (8th Cir. 1995). The district court did not abuse its discretion in any of the contested discovery rulings.

### IV.

Based on the foregoing, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.